**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | 2:25cr168 |
| ) | **Electronic Filing** |
| **MARCUS LATIMER** ) | |

## MEMORANDUM OPINION

On June 17, 2025, a grand jury returned a two count indictment against Marcus Latimer ("defendant"), charging him at count one with possession of a firearm by a convicted felon, on or about February 27, 2024, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e); and at count two with possession of a firearm by a convicted felon, on or about April 24, 2025, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e).  Each count identified the prior predicate felony offenses to support § 924(e) as a March 31, 2000, conviction for aggravated assault, robbery and criminal conspiracy in the Allegheny County Court of Common Pleas at Docket No. CP-02-CR-0007668-1999; a July 11, 2000, conviction for possession with the intent to deliver a controlled substance in the Allegheny County Court of Common Pleas at Docket No. CP-02-CR-0003455-2000; and an October 8, 2003, conviction for aggravated assault, robbery and criminal conspiracy in the Allegheny County Court of Common Pleas at Docket No. CP-02-CR-0012574-2002.

The indictment also contains a "notice of special findings."  This section notifies defendant that as to count one of the indictment, the government is seeking to establish that the same prior predicate offenses identified therein constitute convictions for a serious drug offense and/or a violent felony, as defined in 18 U.S.C. §§ 924(e)(2)(A) and 924(e)(2)(B), and these offenses were committed on occasions different from one another.  In the event of conviction, if these convictions are proved and are qualifying predicate offenses, they would subject defendant to the enhanced penalties in the Armed Career Criminal Act, 18 U.S.C. § 924(e).

Presently before the court are defendant's pretrial motions for notice of the evidence the government intends to use under Federal Rules of Evidence 404(b) and 609; to preserve law enforcement rough notes; to dismiss the indictment pursuant to the Second Amendment as construed by New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111 (Jun. 23, 2022), and Range v. Attorney General, 124 F.4th 218 (3d Cir. 2024) (*en banc*) ("Range II"); and to dismiss or strike the special findings section of the indictment related to the Armed Career Criminal Act. The government has filed a response to these motions. For the reasons set forth below, defendant's motions for prior act notice and to preserve rough notes will be granted; defendant's motion to dismiss the indictment will be denied as to his facial challenge pursuant to the Second Amendment, his due process challenge and his Commerce Clause challenge; an evidentiary hearing will be scheduled on defendant's as-applied challenge pursuant to the Second Amendment; and an order will be entered granting the government's request for sixty additional days to present its substantive position on defendant's motion to strike the special findings.

Defendant moves for timely notice of any prior bad acts and past criminal convictions the government intends to introduce pursuant to Rules 404(b) and 609. He also seeks a pretrial hearing to determine the admissibility of any such evidence. The government responds that it recognizes its responsibility to provide notice in accordance with Rule 404(b) and it intends to comply fully with those obligations. It notes that a trial date has not been set and suggests that a disclosure date of three weeks prior to trial is more than sufficient time for defendant to prepare for the use of any evidence identified in the notice. It also will comply with the notice requirement in Rule 609(b). And it indicates that in the event defendant chooses to testify it will use any such records and evidence as impeachment material to the extent it is appropriate to do so under Rule 609.

The government is required to give notice of its intention to use Fed. R. Evid. 404(b) evidence prior to trial. Rule 404(b) specifically provides "that upon request by the accused the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . of the general nature of any evidence it intends to introduce at trial." Recent revisions now obligate the government to also "articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose."

Other than the identification of the purpose for the evidence and the supportive reasoning for that purpose, the rule requires only the disclosure of the general nature of the evidence the government intends to introduce. A demand for specific evidentiary detail, such as dates, times, places and persons involved is overly broad. See United States v. Alex, 791 F. Supp. 723 (N.D. Ill. 1992). Thus, the disclosure of the general nature of such evidence is that which is sufficient to put a defendant on notice as to which of his or her past episodes of conduct may be used by the government at trial.

What constitutes "reasonable notice in advance of trial" is determined by the circumstances and complexity of the prosecution. In Alex, the court ordered disclosure of Rule 404(b) evidence seven days prior to trial. In contrast, the court in United States v. Williams, 792 F. Supp. 1120, 1133 (S.D. Ind. 1992), noted generally that disclosure within ten days prior to trial constitutes reasonable advanced notice. Similarly, in United States v. Evangelista, 813 F. Supp. 294, 302 (D.N.J. 1993), the court ruled that disclosure ten business days prior to trial is sufficient notice.

Here, the rule provides defendant with the right to formal notice of all potential Rule 404(b) evidence which the government intends to introduce at trial as well as the articulated purpose for which admission will be sought and the reasoning that supports its use for that purpose. Accordingly, the court will grant the defendant's Rule 404(b) motion and direct the

3

government to provide the required general notice, corresponding purpose and supportive reasoning for that purpose no later than fifteen business days prior to trial.

Rule 609(b) requires the government to provide advanced written notice of its intent to use a conviction that is more than 10 years old (or where 10 years has elapsed since the release of the witness from confinement, whichever is later) for impeachment purposes. Advanced notice in these circumstances is required in order to "provide the adverse party with a fair opportunity to contest the use of such evidence." Fed. R. Evid. 609(b). There is no similar disclosure requirement under Rule 609(a).[1] Consequently, the court can only order the government to provide advanced written notice of its intent to proffer Rule 609(b) evidence.

The government has not indicated whether it is aware of any conviction falling within the ambit of Rule 609(b). Nonetheless, the government acknowledges that intends to comply with the notice requirement and notes it has provided defendant with a copy of his criminal history, which documents his criminal convictions. It indicates that while it has not identified the specific acts or convictions it might seek to introduce in its case-in-chief, it will use any conviction falling under Rule 609 to impeach defendant should he decide to testify.

To the extent the government becomes aware of any Rule 609(b) evidence and intends to use it at trial, it will be required to provide notice of that intent at the same time it provides notice under Rule 404(b), at least fifteen business days prior to trial.

Numerous courts have recognized that a defendant is not entitled to a pretrial hearing on Rule 404(b) or Rule 609(b) evidence identified by the government. See, e.g., United States v. Blackwell, 954 F. Supp. 944, 964 (D. N.J. 1997) (a district court need not conduct a pretrial evidentiary hearing simply because the defendant asks for such a hearing) (citing United States

---

[1] Rule 609(a) is limited to the use of prior convictions and does not authorize the use of arrests or uncharged misconduct to impeach the testimony of an accused.

v. Sophie, 900 F.2d 1064, 1071 (7th Cir.) ("A district court does not have to hold evidentiary hearing on a motion just because a party asks for one."), cert. denied, 498 U.S. 843 (1990).  At the very least, a defendant must make a colorable claim for relief before the discretion to conduct such a hearing is brought into play.  Id.  Defendant has not made such a showing here.  Consequently, his request for a pretrial hearing on the admissibility of evidence which has not yet been identified will be denied without prejudice to renew at or shortly before trial.

Defendant also requests an order directing all government agents and law enforcement officials involved in any aspect of this case to preserve all rough notes made during the course of the investigation.  He further requests that any such materials be reviewed for statements or information falling within Brady or the Jencks Act.

The government indicates that it does not object to an order obligating any federal officer to preserve his or her rough notes.  It objects to the extent any such order seeks to control the behavior of local officers who might be subject to differing department policies.  The government does not address when any such notes will be produced.

In United States v. Vella, 562 F.2d 275 (3d Cir. 1977), the Third Circuit held that "rough interview notes of [law enforcement officers] should be kept and produced so that the trial court can determine whether the notes should be made available to the defendant under the rule in Brady . . . or the Jencks Act."  Id. at 276.  In United States v. Ammar, 714 F.2d 238 (3d Cir. 1983), the court acknowledged that a rough draft is not necessarily a Jencks Act statement until it is refined to the point where a finding can be made that the witness has "adopted or approved" the rough draft as a statement, such as where a law enforcement official presents a handwritten draft to a supervisor.  Nevertheless, the court held that "the government must retain and, upon motion, make available to the district court both the rough notes and the drafts of reports of its agents to facilitate the district court's determination of whether they should be produced."  Id. at

259. The court also cautioned that "the government must be vigilant in observing its responsibility to preserve these materials because the Supreme Court has cautioned that the harmless error doctrine must be strictly applied in Jencks Act cases." Id. at 260 (citations omitted).

Defendant's request for an order requiring all government agents to preserve their rough notes and writings will be granted.[2]  Defendant is entitled to the discovery of such material only to the extent it falls within the purview of Brady and/or the Jencks Act.  To the extent any rough notes and investigative reports fall within these limited areas of disclosure, the government shall produce them in accordance with this memorandum opinion and the accompanying order of court.  To the extent defendant seeks the production of any rough notes and investigative reports not falling within those limited areas of disclosure, the motion will be denied without prejudice to renew at trial subject to a specific showing that any particular rough notes or investigative reports not otherwise produced arguably may contain information falling within the scope of Brady and/or the Jencks Act.

Defendant moves to dismiss the indictment on the grounds that it violates the Second Amendment, the Due Process Clause, and the Commerce Clause.  He advances facial and as applied challenges pursuant to the Second Amendment as well as void-for-vagueness and Commerce Clause challenges.

---

[2] This order will extend to federal, state and local officers involved in the investigation and/or prosecution of the case.  The court's authority for ordering such measures is not limited to the officer's employer or the department involved.  Instead, the authority emanates from the court's obligation to administer the matters before it in accordance with the Due Process Clause.  In the event the government becomes aware of any lost or previously destroyed material falling within the scope of the court's orders, it shall promptly notify this court and opposing counsel of the same and the specific circumstances pertaining to the loss or destruction.  The court will then determine an appropriate course of action.

More specifically, defendant maintains that an "as applied" analysis pursuant to Bruen and United States v. Rahimi, 602 U.S. 680 (2024), renders counts one and two unconstitutional under the Second Amendment because a proper Second Amendment analysis requires a text-and-history approach that focuses on historical analogs and restrictions that are limited to regulations that were permissible at the founding. Moreover, in Range II, the Third Circuit did acknowledge that "physically dangerous people" could be disarmed, "at least temporarily." Range II, 124 F.4th at 228. Nevertheless, the court rejected the government's position that it could meet its burden by analogizing to the founding-era disarmament of disfavored groups like "Loyalists, Native Americans, Quakers, Catholics, and Blacks," because "any such analogy would be 'far too broad.'" Range II, 124 F.4th at 229 (quoting Bruen, 597 U.S. at 31)). It likewise rejected the government's efforts to meet its burden by categorical argument, *i.e.* that the constitutionality of § 922(g)(1) can be upheld based on the proposition that individuals convicted of serious crimes can be expected to misuse firearms.

Against this backdrop, defendant maintains that the panel decision in Pitsilides v. Barr, 128 F.4th 203 (3d Cir. 2025), inappropriately departed from Bruen's framework when it "derived a principle that disarmament is consistent with the Second Amendment 'as long as a felon continues to 'present a special danger of misus[ing firearms],' . . . in other words, when he would likely 'pose[ ] a physical danger to others' if armed.'" Id. at 210 (quoting Rahimi, 602 U.S. at 698). This misapplication was only compounded by the Pitsilides court's directive that district courts "adjudicating as-applied challenges to § 922(g)(1) consider a convict's entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction, to evaluate whether he meets the threshold for continued disarmament." According to defendant, neither Rahimi nor Range II endorsed a

principle that the government may disarm those who present a special danger of misusing a firearm.

So from defendant's perspective, the text and history approach properly focuses on the offense and the analogous forms of punishment that were rooted in the nation's tradition and history at the time the Second Amendment was ratified. Under such a properly confined analysis, the government cannot identify founding-era analogues supporting permanent disarmament of individuals with prior convictions like those of defendant. And even under the broader inquiry permitted by Pitsilides, the government's use of uncharged allegations, tenuous inferences, and old criminal conduct are in any event insufficient to establish 1) that defendant presents a likelihood of posing a physical danger to others if armed or 2) any other sufficient grounds for lifetime disarmament.

The government posits that in Rahimi the Supreme Court reaffirmed that the longstanding prohibitions on felons possessing guns, of which § 922(g)(1) is the paradigmatic example, are presumptively lawful. Gov. Brief in Opposition (Doc. No. 34) at p.9 (quoting Rahimi, 144 S. Ct. at 1902; and citing Moore, 111 F.4th at 272 (a court may consider the challenger's circumstances "regardless of whether they were charged")). Notwithstanding this presumption, it is proper for a court considering an "as applied" challenge to conduct a hearing wherein the court "must consider a convict's entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction, to evaluate whether he meets the threshold for continued disarmament." Id. (quoting Pitsilides, 128 F.4th at 212). And here, unless the defendant concedes that the firearm he possessed with regard to count one had an obliterated serial number and he was under indictment when he possessed the firearm charged in count two, the government is prepared to demonstrate these facts at such a hearing. It also is prepared to present evidence reflecting that defendant has

8

an extensive criminal history of violence and drug trafficking; and he was involved in such activity and/or using drugs while contemporaneously possessing the firearms and ammunition at issue.

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "In District of Columbia v. Heller, the Supreme Court held that the Second Amendment 'confer[s] an individual right to keep and bear arms' for traditionally lawful purposes, such as self-defense within the home." United States v. Quailes, 126 F.4th 215, 219 (3d Cir. 2025) (citing Heller, 554 U.S. 570, 595, 629). But the right "is not unlimited." Heller, 554 U.S. at 626. And the Court specifically noted that "nothing in [its] opinion should be taken to cast doubt" on laws like § 922(g)(1) that prohibit "the possession of firearms by felons." Id. at 626–27, n.26.

The constitutional standard endorsed in Heller was made more explicit in Bruen, where the Court announced "a new two-step analytic framework for analyzing Second Amendment challenges to firearm regulations." Quailes, 126 F.4th at 219 (citing Bruen, 597 U.S. at 31). "Courts must first determine whether 'the Second Amendment's plain text covers an individual's conduct.'" Id. at 219. "If it does, the Second Amendment 'presumptively protects that conduct." Id. In that event the court must "proceed to Bruen's second step, where 'the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.'" Id. "If the government satisfies its burden, the firearm regulation passes constitutional muster." Id.

In Rahimi, the Supreme Court cautioned that its recent rulings in this arena "were not meant to suggest a law trapped in amber." 602 U.S. at 691. The Court clarified that "the appropriate analysis" under Bruen's second step "involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." "Why and

9

how the regulation burdens the right are central to this inquiry." Id.  "For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." Id.  Similarly, even though a law regulates arms-bearing for a permissible reason, it may nevertheless transgress the Second Amendment "if it does so to an extent beyond what was done at the founding." Id.  "And when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" Id.  While a law "must comport with the principles underlying the Second Amendment, it need not be a 'dead ringer' or a 'historical twin.'" Id.

In other words, "[u]nder Rahimi's principles-focused approach to analogical reasoning, courts are to evaluate challenged regulations at a higher level of generality than whether 'those regulations [are] identical to ones that could be found in 1791.'" United States v. Jamison, 2025 WL 2415749, *2 (M.D. Pa. Aug. 20, 2025).  Instead of searching for a perfect statutory analogue, courts are to draw on "relevantly similar" historical regulations to derive "principles underlying the Second Amendment" and then ask if the modern-day regulation "comport[s] with th[ose] principles" in terms of "why and how it burdens the Second Amendment right." Rahimi, 602 U.S. at 692.  When conducted in this manner, application of the Second Amendment "is 'a commonplace task for any lawyer or judge.'" Id. (citing Bruen, 597 U.S. at 28).

In United States v. Moore, the United States Court of Appeals for the Third Circuit considered whether disarming convicts on supervised release was "consistent with the Nation's historical tradition of firearm regulation." 111 F.4th 266, 269 (3d Cir. 2024) (quoting N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 24 (2022)).  After conducting the historical analysis required under Bruen as augmented by Rahimi, the court concluded that the government had met its burden to show that "history and tradition support disarming convicts who are

10

completing their sentences," which extends through the completion of supervised release. Moore, 111 F.4th at 273. In United States v. Quailes, the court extended Moore's logic to the state equivalents of federal supervised release, "including a sentence of parole or probation." 126 F.4th 215, 217 (3d Cir. 2025).

In Pitsilides, the Third Circuit addressed another civil case in which a plaintiff convicted of a felony offense sought a declaration that as applied to him, Section 922(g)(1) would violate the Second Amendment. 128 F. 4th at 205. Pitsilides admittedly was a frequent gambler and had been a professional poker player for a good number of years. He operated a successful chain of restaurants in Virginia and the Carolinas. He was convicted in 1998 under Pennsylvania law of one count of criminal conspiracy to commit pool selling and bookmaking and two counts of pool selling and bookmaking. In 2011, he was also convicted in Virginia of two counts of owning a place where illegal gambling was occurring. Id. at 206. The district court granted summary judgment in favor of the government under the previous framework utilized in Binderup v. Attorney General, 836 F.3d 336 (3d Cir. 2016) (*en banc*), abrogated by Bruen, reasoning that Pitsilides could not show his prior convictions were not serious. In so ruling, the district court relied on a "cross-jurisdictional consensus" holding that bookmaking, pool selling and similar crimes were sufficiently serious to permit disarmament pursuant to § 922(g)(1). Pitsilides, 128 F.4th at 206. Pitsilides appealed.

On appeal, Pitsilides took the position that as applied to him, Section 922(g)(1) was unconstitutional because there was "no historical tradition of permanent disarmament for gambling related offenses" and he did not pose "a credible threat to a person or society." Id. at 208. In analyzing these contentions, the court distilled the teachings of Bruen, Rahimi, and Range II and then applied those lessons to the case as presented. Id.

The Pitsilides court deduced three principles from Bruen, Rahimi, and Range II.  First, a court's "inquiry into *principles* that underlie our regulatory tradition does not reduce historical analogizing to an exercise in matching elements of modern laws to their historical predecessors." Instead, the question is "whether the principles embodied in different strands of historical firearm regulations, '[t]aken together,' Rahimi, 602 U.S. at 698, 144 S.Ct. 1889, support contemporary restrictions, all the while remaining vigilant 'not to read a principle at such a high level of generality that it waters down the right,' id. at 740, 144 S.Ct. 1889 (Barrett, J., concurring)." Id. at 210 (emphasis supplied).

"Second, whatever other recourse may or may not be available, felons seeking to challenge the application of § 922(g)(1) at least may bring declaratory judgment actions." Id. But relief may only be granted where the record is "sufficient for a court to make an individualized determination that the applicant does not presently pose the kind of danger envisioned by Rahimi and Range II" and such a "determination necessarily demands individualized fact-finding." Id. (quoting Heller, 554 U.S. at 622).

And finally, "while Rahimi and Range II did not purport to comprehensively define the metes and bounds of justifiable burdens on the Second Amendment right, they do, at a minimum, show that disarmament is justified as long as a felon continues to 'present a special danger of misus[ing firearms],' in other words, when he would likely 'pose[ ] a physical danger to others' if armed.'" Id. (quoting Rahimi, 602 U.S. at 698; Range II, 124 F.4th at 232).  And so what has become clear is "that the 'Second Amendment's touchstone is dangerousness.'" Id. at 210. Nevertheless, this principle cannot be employed "at such a high level of generality that it waters down the right." Id. (quoting Rahimi, 602 U.S. at 740) (Barrett, J., concurring).  Instead, "a special danger of firearm misuse justifies disarmament when the harm at risk is relevantly similar to the kinds of harm that history shows justify disarmament." Id. at 210, n. 3 (quoting Folajtar,

980 F.3d at 924 (Bibas, J., dissenting); citing Kanter v. Barr, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting), United States v. Bullock, 123 F.4th 183, 185 (5th Cir. 2024) (per curiam), United States v. Williams, 113 F.4th 637, 657 (6th Cir. 2024), and United States v. Jackson, 110 F.4th 1120, 1128 (8th Cir. 2024)).

Although some offenses may provide conclusive evidence that the individual poses "a special danger of misusing firearms" against another, the inquiry often depends on the nature of a person's prior felony conviction. Id. at 211 (highlighting the scenario presented in Range II). "As the Sixth Circuit similarly observed, at least one principle underlying the Second Amendment - that a legislature may disarm those who pose a physical danger to others - calls for examination of 'each individual's specific characteristics,' which 'necessarily requires considering the individual's entire criminal record—not just the predicate offense for purposes of § 922(g)(1).'" Id. (quoting Williams, 113 F.4th at 657–58; and citing Kanter, 919 F.3d at 468 (Barrett, J., dissenting) (instructing courts to look beyond the "conviction" and assess whether the felon's "history or characteristics make him likely to misuse firearms").

Ultimately, the Pitsilides court remanded the case for additional discovery and development of the record bearing on "the prevailing Second Amendment analysis, including whether Pitsilides poses a special danger of misusing firearms in a way that would endanger others." Pitsilides, 128 F.4th at 213. In doing so, the court held:

> Courts adjudicating as-applied challenges to § 922(g)(1) must consider a convict's entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction, to evaluate whether he meets the threshold for continued disarmament. As Range II illustrated, consideration of intervening conduct plays a crucial role in determining whether application of § 922(g)(1) is constitutional under the Second Amendment. See 124 F.4th at 232. Indeed, such conduct may be highly probative of whether an individual likely poses an increased risk of "physical danger to others" if armed. Id.

Id. at 212.

Moreover, the court rejected each parties' construction of the record. It rejected the government's contention that Pitsilides' criminal history was sufficient in itself to conclude that he presented such a danger. Id. And it rejected Pitsilides' position that gambling is not an inherently dangerous activity and there is a lack of Founding-era restrictions on firearm possession as a result of illegal gambling. Id. at 212. As to Pitsilides' position, the court further opined:

> But [Pitsilides' position] mistakes the relevant inquiry. Our consideration of history is not a hunt for "historical twin[s]," Bruen, 597 U.S. at 30, 142 S.Ct. 2111 (emphasis omitted), or "a doomed quest for historical dead ringers," Range II, 124 F.4th at 278 (Krause, J., concurring in the judgment). Instead, we look to the principles underlying our regulatory tradition, and the question here is whether Pitsilides may be disarmed consistent with the historical principle that legislatures may disarm a person who poses a danger to the physical safety of others. See Rahimi, 602 U.S. at 693, 144 S.Ct. 1889 ("From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others."); Range II, 124 F.4th at 232 (concluding § 922(g)(1) was unconstitutional as applied when "the record contains no evidence that Range poses a physical danger to others"); see also Bullock, 123 F.4th at 185 (recognizing legislatures may prevent "dangerous people from possessing guns" (quoting Kanter, 919 F.3d at 451 (Barrett, J., dissenting))); Williams, 113 F.4th at 662 (holding "Congress may disarm individuals they believe are dangerous"); Jackson, 110 F.4th at 1128 (concluding disarmament is constitutional for people who would pose an "unacceptable risk of danger if armed").

Id. at 212. And the scope of this undertaking includes direct involvement in physical violence as well as criminal activity that has a significant threat of violence or danger. Id. (citing Folajtar, 980 F.3d at 922 (Bibas, J., dissenting) ("though residential burglary and drug dealing are not necessarily violent, they are dangerous because they often lead to violence") and Williams, 113 F.4th at 659 (legislatures may disarm those convicted of drug dealing or burglary because, while "[t]hese crimes do not always involve an immediate and direct threat of violence," they "may nonetheless pose a significant threat of danger," warranting disarmament).

Here, the framework established by Pitsilides makes two points clear at this juncture: first, defendant's contention that a properly confined analysis must be limited to a search for founding-era analogues supporting permanent disarmament of individuals with prior convictions

14

like those of defendant is unavailing. This court is bound by <u>Pitsilides</u> and we are duty bound to consider defendant's entire criminal history and post-conviction conduct to the extent it is indicative of dangerousness, along with defendant's predicate offenses and the conduct giving rise to those convictions. And only after consideration of such an expanded record can this court make the individualized assessment as to whether defendant continues to present a special danger of misusing firearms and would likely pose a physical danger to others if armed. And under this broader inquiry, the government may seek to introduce uncharged allegations, reasonable inferences, and prior criminal conduct.

Second, defendant's "as applied" challenge cannot be adjudicated based on the current record. The government has the burden of proving the foundation for defendant's continued disarmament and the current record consists of nothing more than the allegations contained in counts one and two of the indictment. No evidence is before the court to establish the points the government intends to rely on: namely that defendant has an extensive criminal record of violence and drug trafficking; the firearm involved in count one had an obliterated serial number; defendant was under felony indictment at the time he possessed the firearm charged in count two; and defendant was involved in drug trafficking and/or drug use while contemporaneously possessing the firearms and ammunition charged in the indictment. It follows that a <u>Pitsilides</u> hearing is required and accordingly such a hearing will be scheduled.

Defendant's remaining challenges to the constitutionality of § 922(g)(1) can be readily resolved. Defendant's efforts to mount a facial challenge to § 922(g)(1) are without merit. "A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case." <u>United States v. Marcavage</u>, 609 F.3d 264, 273 (3d Cir 2010) (quoting <u>City of Lakewood v. Plain Dealer Publ'g Co.</u>, 486 U.S. 750, 770 n. 11 (1988)). "A party asserting a facial challenge 'must establish that no set of circumstances exists under

15

which the Act would be valid.'" United States v. Mitchell, 652 F.3d 387, 405 (3d Cir. 2011) (*en banc*) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)); accord United States v. Rahimi, 602 U.S. 680, 693 (2024) (to succeed on a facial challenge a defendant must "establish that no set of circumstances exist under which [§ 922(g)(1)] would be valid.").

Defendant cannot make the requisite showing. The United States Court of Appeals for the Third Circuit has held post Bruen that § 922(g)(1) is constitutional in at least some circumstances, such as when it is applied to those on parole, probation, or supervised release. United States v. Quailes, 126 F.4th 215, 224 (3d Cir. 2025) (parole or probation), cert. denied, 146 S. Ct. 127 (2025); United States v. Moore, 111 F.4th 266, 272, 273 & n.5 (3d Cir. 2024) (supervised release), cert. denied, 145 S. Ct. 2849 (2025). It also has held that an individual may be disarmed "consistent with the historical principle that legislatures may disarm a person who poses a danger to the physical safety of others." Pitsilides, 128 F.4th at 210 (citing Rahimi, 602 U.S. at 698; Range II, 124 F.4th at 232; Bullock, 123 F.4th at 185; Williams, 113 F.4th at 657; and Jackson, 110 F.4th at 1128.)) These established bases in which § 922(g)(1) remains constitutional foreclose defendant's facial challenge.

Defendant's due process challenge likewise falls short. "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304 (2008) (citing Hill v. Colorado, 530 U.S. 703, 732 (2000) and Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972)); accord Interactive Media Entertainment and Gaming Ass'n Inc. v. Attorney General of U.S., 580 F.3d 113, 116 (3d Cir. 2009) (same). A conviction here will not offend either of these tenants.

Defendant did not seek prospective relief from the application of Section 922(g)(1) based on the nature of his prior conviction and a proposed course of lawful conduct. He thus remains in the category of people the legislature banned from possessing a firearm under Section 922(g)(1). After all, with minor exceptions not relevant here, the Supreme Court has repeatedly cautioned that the statute presumptively applies to all individuals who have been convicted of a prior felony offense. And "[w]here, as here, a plaintiff raises a facial challenge to a statute on vagueness grounds, the plaintiff 'must demonstrate that the law is impermissibly vague in all of its applications.'" Interactive Media Entertainment, 580 F.3d at 116 (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982) (emphasis in original)). The same authority foreclosing defendant's facial challenge under Bruen and Range II applies with equal force to his due process challenge.

Moreover, there is no indeterminacy of what fact the government must prove to obtain a conviction under the statute. There is no question that the grand jury charged defendant at each of counts one and two with incurring such a prior factual event/offense. And more to the point, that Brian Range gained prospective relief from Section 922(g)(1) for his particular circumstances did not reduce the application of this straightforward statute into one of subjective assessments or judgments by government officials. Post Range II, the elements remain unchanged as does the breadth of the statute. Under these circumstances, defendant's due process challenge for vagueness rings hollow. Cf. Williams, 553 U.S. at 306 ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.").[3]

---

[3] Defendant recognizes the Supreme Court's "post-New Deal precedents" foreclose any argument that § 922(g)(1) violates the Commerce Clause. He merely seeks to preserve his challenge that Congress does not have the authority under the Commerce Clause to promulgate

17

Further proceedings will be held on defendant's motion to dismiss or strike the "special findings" of the indictment related to the Armed Career Criminal Act. Defendant contends that the prior 2011 conviction for possession with the intent to deliver cocaine changed in the special findings section of the indictment cannot satisfy the definition of a serious drug offense as defined in 18 U.S.C. § 924(e)(2)(A) because Pennsylvania law criminalizes a broader swath of the drug's isomers than does federal law. As a result, it cannot serve as a categorical match to the federal definition of the offense and the enhanced penalties in § 924(e) cannot be applied. He seeks a pre-conviction ruling to this effect.

The parties present competing positions and authority regarding the ripeness and appropriateness of addressing defendant's challenges to the predicate offenses. Relying on United States v. Shelton, 21cr216 (Doc. No. 75), (W.D. Pa. August 12, 2022), the government insists that the court lacks jurisdiction over the matter because the issue presented does not become ripe until a defendant pleads guilty or is convicted of the offense. Defendant insists that there is ample and persuasive authority for adjudicating the matter at this juncture.

We will resolve defendant's motion to strike. As to the issue of ripeness, we are persuaded by the ruling in United States v. Slade, 23cr254 (Doc. No. 86) (W.D. of Pa. Oct. 22, 2025). There, Judge Horan opined and ruled:

> The Court has considered the government's argument, that "whether the defendant's prior convictions qualify as ACCA predicates is premature and should not be ruled upon until after a finding of guilty either by trial or guilty plea." Gov. Resp. 3. The government included the Notice of Special Findings section in the Indictment in order to comply with the Supreme Court's holding that, "any fact that increases the mandatory minimum is an "element" that must be submitted to the jury,' and "found beyond a reasonable doubt." Alleyne v. United States, 570 U.S. 99, 103, 108 (2013). The ACCA enhancement, if applicable, increases Mr. Slade's statutory mandatory minimum sentence to fifteen years. As such, the increase in sentencing exposure is unlike a post-conviction determination increasing a defendant's offense level based upon factors specified in the Sentencing Guidelines. Such increases may result in an increased advisory guideline sentence, but

---

the statute. Of course, at this time there is a lack of precedent for such a position and we must reject it for this reason.

18

they will not result in an increased mandatory minimum term of imprisonment. Mr. Slade's present challenge presents an issue of law to be determined by the court: whether his prior convictions are "serious drug offenses." That issue may be determined pretrial, or it may be determined after a conviction. To address Mr. Slade's challenge prior to a determination of guilt does not prejudice the government. Therefore, as a practical matter and in the interest of justice, the Court concludes that addressing Mr. Slade's challenge to the application of ACCA on a pretrial motion is warranted.

Id. at p. 5.

That reasoning applies with equal force here. The government needs to comply with Alleyne before it can insist on the enhanced penalties at § 924(e). The necessary determinations are not the equivalent of sentencing factors under the Guideline. And the challenge here presents an issue of law for the court to decide. The government cannot be prejudiced by the timing of those determinations. Thus, the court has discretion to decide the issue now or after a determination of guilt has occurred.

The court will exercise its discretion and entertain defendant's challenge pretrial. Practical considerations and the interest of justice counsel in favor of such an approach. And if the court were to submit the matter to a jury and thereafter determine that the conviction does not qualify as a serious drug offense, it appears that the principles of judicial economy and avoiding advisory determinations would be undermined in compounded ways.

The government did not address the merits of defendant's argument. Instead, it noted the various hearings and appeals where a similar issue has been raised and argues that the determination raises areas of law in flux. And it "ask[ed] that the court set a response date sixty (60) days from the date of its Order ruling on the ripeness issue." Government Omnibus Response (Doc. 34) at p. 8 n.1. While the court will reserve judgment as to whether the matter is complex and/or presents an area of law in flux, it will treat the government's request as a motion under the Speedy Trial Act and enter an order requiring the government's substantive response to the motion in sixty days.

For the reasons set forth above, defendant's motion for Rule 404(b) and Rule 609 notice will be granted as indicated above; defendant's motion to dismiss the indictment will be denied as to his facial challenge pursuant to the Second Amendment, his due process void-for-vagueness challenge and his challenge pursuant to the Commerce Clause; an evidentiary hearing will be scheduled on defendant's as-applied challenge pursuant to the Second Amendment; and an order will be entered granting the government's request for sixty additional days to present its substantive position on defendant's motion to strike the special findings. An appropriate order will follow.

<u>Date: March 3, 2026</u>

<u>s/David Stewart Cercone</u>
David Stewart Cercone
Senior United States District Judge

cc:   Lee A. Fry, AUSA
      Gabrielle I. Lee, AFPD

   (*Via CM/ECF Electronic Mail*)